IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

FILED by __VT__ D.C.
ELECTRONIC

**August 3, 2009**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. · MIAMI

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| BYRON DENVER HATCHER and KIM | ) |
| COLLEEN REINHART, individually and | ) |
| d/b/a PRUDENTIAL TRUSTEES, | ) |
| BAHAMAS BUSINESS CENTRE, | ) |
| EQUITY MUTUAL FUNDING, TRUSTEE | ) |
| ACCOUNTING, UNIVERSAL | ) |
| DOCUMENTS, and CARIBBEAN | ) |
| FORWARDING, | ) |
|  | ) |
| Defendants. | ) |

Civil No.

**09-CV-14263-Graham-Lynch**

## COMPLAINT FOR PERMANENT INJUNCTION AND OTHER RELIEF

The United States of America makes the following allegations against the

defendants, Byron Denver Hatcher and Kim Colleen Reinhart, doing business as

Prudential Trustees, Bahamas Business Centre, Equity Mutual Funding, Trustee

Accounting, Universal Documents, and Caribbean Forwarding:

1. This is a civil action brought by the United States pursuant to §§ 7402(a) and

7408 of the Internal Revenue Code of 1986 (26 U.S.C.) ("IRC") to enjoin defendants and

anyone in active concert or participation with them, from:

(a) organizing, promoting, or selling any so-called "asset protection" arrangement, or any other tax shelter, plan, or other arrangement that advises or assists customers to attempt to violate the internal revenue laws or unlawfully evade the assessment or collection of their federal tax liabilities including;

(b) making false statements in connection with such organization, promoting, or selling, about the allowability of any deduction or credit, the excludability of any income, or the securing of any tax benefit by reason of participating in any such tax shelter, plan or other arrangement;

(c) engaging in any other activity subject to penalty under I.R.C. §§ 6700, 6701, or any other penalty provision in the Internal Revenue Code;

(d) engaging in conduct designed or intended to, or having the effect of, obstructing or delaying any Internal Revenue Service investigation or audit; and

(e) engaging in any other conduct that interferes with the proper administration and enforcement of the internal revenue laws.

## Jurisdiction

2.  This civil action has been requested by the Chief Counsel of the Internal Revenue Service, a delegate of the Secretary of the Treasury, and commenced at the direction of a delegate of the Attorney General of the United States.

3.  Jurisdiction is conferred upon this Court by I.R.C §§ 7402(a) and 7408, and 28 U.S.C. §§ 1340 and 1345.

4. Venue is proper in this Court under 28 U.S.C. §§ 1391 and 1396 because defendants reside in this judicial district and a substantial part of the conduct described in this complaint occurred in this judicial district. Byron Hatcher and Kim Reinhart are both United States citizens who own and sometimes reside in a condominium at 5080 Harmony Circle, #103, Vero Beach, Florida 32967; they also sometimes live in the Bahamas. They operate the scheme described in this complaint both from Florida and from the Bahamas.

## Defendants

5. Since at least 1997, defendants Byron Hatcher and Kim Reinhart, a married couple, have been actively involved in organizing and promoting fraudulent offshore "asset protection" schemes. Defendants create and use sham foreign trusts and sham foreign corporations to facilitate the understatement of scheme participants' federal tax liabilities. As implemented by the defendants, "asset protection" is a euphemism for "tax fraud."

6. Defendants further aid and abet the understatement of participants' tax liabilities by maintaining the books and records for all of participants' purported offshore trusts and corporations and transferring participants' funds between various bank accounts. Participants use these accounting records to prepare their tax returns and understate their tax liabilities.

7. Defendant Hatcher does not have a formal education in the area of tax.

3

However, Hatcher's tax knowledge is apparently extensive from his dealings with American attorney Harold Uhrig and Bahamian attorney Obafemi Pindling. For example, Hatcher has created and maintains two websites related to defendants' offshore asset-protection scheme. The websites contain detailed discussions concerning domestic and foreign trusts, offshore strategies, estate planning, limited liability companies, and limited liability partnerships.

8.  Hatcher has a long history of personal tax-law violations. Hatcher has delinquent federal income tax debts for 1989, 1990, 1991, 1992, and 1996. The balance owed by Hatcher is $885,000, plus interest accruing from October 20, 2008.

9.  Hatcher has controlled at least 13 business ventures over the years, excluding the entities he established for his offshore asset-protection scheme. Most of these entities appeared to have been involved in the real-estate-development business. The IRS has determined that every entity Hatcher controlled has either failed to file federal employment tax returns (IRS Forms 940 and 941 and Forms W-2), or failed to deposit federal employment tax due, and understated their tax liability on their Forms 940 and 941.

10. Hatcher and Reinhart were found guilty in a Florida state court in 1993 of committing bank fraud against Tomoka State Bank by purchasing vehicles for resale from an auction with fraudulent sight drafts from Tomoka State bank in the amount of $279,963. Defendants failed to have sufficient funds in the bank to cover the sight drafts,

4

failed to provide the certificates of title to the bank, sold the vehicles, and then used the proceeds for their personal living expenses.

11. In 1999, both Hatcher and Reinhart were found in civil contempt for assisting a pornography company in violating a permanent injunction barring the company from spamming America OnLine ("AOL") with Internet pornography advertisements.

12. In 2003, judgment was entered against both Hatcher and Reinhart in a civil forfeiture action involving Hatcher's and Reinhart's failure to declare $86,466.00 in currency and money orders in violation of currency transaction reporting requirements.

13. Hatcher and Reinhart have both been uncooperative with the IRS by failing to appear when summonsed and failing to provide requested records.

### Background

14. In 1997, Hatcher and Reinhart, along with Florida attorney Harold Uhrig, became involved in Global Services, Inc., a company which set up sham offshore International Business Corporations ("IBCs") and trusts in the Bahamas for Hatcher and Reinhart's customers. Hatcher worked closely with a Bahamian attorney, Obafemi ("Obi") Pindling, to obtain approval from the Bahamian government to set up IBCs in the Bahamas. Uhrig prepared the necessary legal documents and held customers' funds in his escrow account in Florida until they were transferred offshore to the Bahamas. Reinhart handled the accounting work. The scheme failed when the customers' money disappeared after being transferred into an offshore account.

5

15. Uhrig and Hatcher started their own asset-protection scheme in 1998 using the offshore structure they had established with Global Services in 1997. Uhrig prepared the legal documents for use in implementing the scheme. Hatcher continued his relationship with Obi Pindling and the Bahamian government so that Hatcher was allowed to set up IBCs, trusts, and offshore credit cards in the Bahamas. Hatcher also maintained the books and records for participants' purported offshore trusts and corporations and transferred scheme participants' funds between different foreign and domestic bank accounts. Uhrig and Hatcher parted company in 2001.

16. Currently, Hatcher and Reinhart control the entire asset-protection scheme that they started in 1998. There are other individuals involved, but the IRS has not yet determined their identities and locations.

## Mechanics of the Asset-Protection Scheme

17. Hatcher and Reinhart help customers transfer their assets and businesses to a series of sham foreign trusts and sham foreign corporations. Scheme participants continue to control their assets and businesses with defendants' assistance. At the direction of scheme participants, defendants pay the customers' employees' wages, and customers' rent and other expenses of the customers and the customers' businesses, using customers' funds and customers' business income. The scheme creates the false impression that a foreign entity owns and controls the scheme participants' assets and

6

businesses while in truth defendants' customers continue to operate their business and own assets in the United States.

18.  According to Hatcher, the defendants obtain scheme participants from attorneys who refer people who have pending lawsuits or judgments against them.  From bank records obtained from Hatcher, the IRS has determined that current scheme participants are located all over the United States, Canada, Europe, Asia, and Australia.

19.  The asset-protection scheme involves several different steps.  Defendants use series of shell entities to hide, track, and control scheme participants' assets and business interests.  The entities continually change in order to keep defendants and their customers a step ahead of law enforcement.  The current entities used by defendants are Prudential Trustees, Bahamas Business Centre, Equity Mutual Funding, Trustee Accounting, Caribbean Forwarding, and American Barrister.

20.  Defendants use Prudential Trustees as a sham trustee of participants' trusts. Defendants use Bahamas Business Centre to create a fake business presence in the Bahamas for scheme participants' shell IBCs.  American Barristers is a purported law firm that purportedly screens scheme participants to make sure they are not involved in any illegal behavior.  Defendants use the other entities to move participants' money around.  Defendants have also issued credit cards to scheme participants through one of defendants' sham entities.

7

21. Next, defendants, for a fee, create a separate sham foreign trust and/or a sham foreign corporation for each scheme participant. Participants place their assets, including their American businesses, into the sham foreign trusts or sham foreign corporations.

22. Defendants have created two websites which are used in the offshore asset protection scheme. The first website, www.PrudentialTrustees.com, promotes the asset-protection scheme, offering tax planning and financial privacy to scheme participants. The second website, www.BahamasBusinessCentre.com, promotes the establishment of a "virtual offshore office" offering scheme participants a false business presence in the Bahamas for their purported "offshore" business.

23. Reinhart sets up bank accounts for the scheme participants' entities and handles all of the bank accounts and accounting records. The participants' names do not appear on any of their entities' bank accounts.

24. Defendants maintain a drop box address in Florida which they use as the business address of every entity (defendants' and scheme participants' entities) involved in the scheme. Reinhart directs that all participants' bank records and credit card statements be mailed to the Florida drop box.

25. Defendants, at the scheme participants' direction, pay the rent, employees' wages, and other bills for scheme participants' American businesses, or invest in American securities — all with the participants' funds held in the names of the sham foreign trusts/corporations. Defendants funnel participants' funds from participants'

8

sham entities through defendants' sham entities in an effort to disguise the origin and the use of participants' funds.

26. Defendants charge participants a fee for handling participants' accounts and ensuring that participants receive their funds on request.

27. Through their websites, defendants falsely represent to participants that moving their assets and business interests into the defendants' various sham foreign trusts and sham corporations produces tax-free income which does not have to be reported on federal income tax returns. These false representations lead to understatements of the participants' tax liabilities on their tax returns.

28. In short, the fabricated IBCs and trusts provide the false appearance that participants' income from their American businesses and American securities is income from a legitimate foreign corporation that is not required to file a tax return in the United States. The participants' assets appear to be unreachable since they are purportedly in an offshore country that does not have a tax treaty with the United States. Since scheme participants' names do not appear on any of these bank accounts and the banks are in another state or country, the money is difficult to trace back to the participants.

29. These transactions are shams, having no economic substance or business purpose. Defendants create the appearance that the participants' entities and assets are offshore by funneling participants' money through various domestic and offshore accounts, and creating a false business presence in the Bahamas when in reality the

9

entities involved maintain their operations and physical location in the United States. Participants' income flowing through Defendants' asset protection scheme is subject to United States' tax laws.

### Fraudulent "Foreign" Trusts

30. Defendants first designate a sham trustee — usually Reinhart or Hatcher — who creates a sham foreign trust with a nominal amount of money. Defendants, on their website www.PrudentialTrustees.com, call these trusts "offshore asset protection trusts," and direct scheme participants to transfer their assets into one of these trusts.

31. Defendants add an unidentified "Protector" to the participant's trust, who controls the activities of the false trustee on behalf of the scheme participant in order to allow the scheme participant to maintain control over the trust assets. Hatcher explained during one of his interviews with the IRS that whenever the defendants transfer funds on behalf of a participant, a "Protector's" order, signed by the participant, is issued to the trustee.

32. Defendants affiliate the trust with a purported law firm, often designating a law firm as the "Protector" of the trust. Defendants then falsely assure participants, through www.PrudentialTrustees.com, that participants do not have to disclose information about the trust assets because any disclosure would violate the attorney-client privilege.

33. In actuality, the purported law firm is nothing but a shell IBC. Further, even if the law firm were real, the attorney-client privilege does not cover every communication, but rather only confidential facts communicated from a client to an attorney for the purpose of obtaining legal advice.

34. On www.PrudentialTrustees.com, defendants falsely assure scheme participants that they no longer own the assets in the foreign trust and that participants can therefore legally avoid the federal tax requirements of a "U.S. Grantor Trust."

35. In actuality, even if the trusts are not shams, transferring assets to a trust in which the beneficial owner retains control creates a grantor trust. Here, the participants are still controlling the trust assets through their "Protector." Accordingly, the assets in the trust are subject to United States tax laws.

36. Defendants, through www.PrudentialTrustees.com, also falsely tell scheme participants that they can receive tax-free compensation from their "foreign" trust for purported services rendered as a consultant, financial advisor, investment advisor, or through contracts between the trust and a domestic business entity owned or controlled by the American participant.

37. In fact, any compensation for such services is taxable income to the recipient.

38. Defendants also tell customers on www.PrudentialTrustees.com that Bahamian laws forbid the exchange of information with other countries and that American subpoenas are not honored in the Bahamas.

11

39. In actuality, a tax information exchange agreement signed in January 2002 between the Bahamas and the United States covers the exchange of information that is foreseeably relevant or material to United States federal tax administration and enforcement including the testimony of an individual and documents or records.

### Fraudulent "Foreign" IBCs and LLCs

40. The participant's trust is usually only part of a more comprehensive purportedly "offshore" structure which implements a different financial strategy for each participant involved. For example, the trusts are sometimes used by participants to purchase an interest in a shell IBC. Participants then use their interest in the shell IBC to hide the ownership and income of their American business.

41. As explained on www.BahamasBusinessCentre.com, defendants establish a presence for participants' IBCs in a tax-haven country, offering encrypted electronic mail, confidential facsimile service, as well as web design and e-commerce services for the shell IBCs.

42. Defendants, through their websites, falsely tell participants that because the IBC is purportedly located in the Bahamas, the income purportedly generated by the IBC is no longer generated from a U.S. source, and therefore is not taxable by the federal government or subject to return-filing requirements.

43. In actuality, the IBCs in the foreign country are merely "shell" corporations which do not generate any income. The participants' income is from American

12

corporations disguised as foreign corporations whose operations and physical location never left the United States.

44. A fake business presence in the Bahamas does not erase the actual presence of an active business in the United States.  Federal tax laws apply to the income from these American businesses.

### Defendants' Entities

45. Hatcher has established at least six entities to assist in his offshore asset protection scheme: Prudential Trustees, Bahamas Business Centre, Universal Documents, Equity Mutual Funding, Trustee Accounting, and Caribbean Forwarding.

46. Prudential Trustees purportedly provides management services for the IBCs owned in whole or in part by one or more of the scheme participants' trusts.  The related website claims that Prudential Trustees offers consulting services, legal advice, asset protection, planning, and management, trust formation, company formation, and offshore corporate credit cards.

47. Prudential also has a "foreign brokerage" program whereby Prudential will open brokerage accounts in the names of participants' trusts.  On www.PrudentialTrustees.com, defendants falsely claim that participants' "foreign" trusts or IBCs can have a brokerage account in any country and that the income earned will be free of any U.S. taxation on capital gains.

13

48. In fact, any income generated from investments in U.S. Securities is effectively connected to a U.S. source, and it is treated as taxable income under federal tax law. Moreover, income earned offshore by U.S. residents is subject to U.S. income tax.

49. Bahamas Business Centre is an "Offshore Services Provider" which offers services such as a local phone and fax number, an offshore mailing address, and mail forwarding, to allow a scheme participant's IBC to gain a "real office presence" in a foreign country.

50. Universal Documents was set up by Hatcher to track the scheme participants' money. Hatcher claims he has phased out Universal and now only uses Prudential Trustees to track participant funds.

51. Trustee Accounting, Equity Mutual Funding, and Caribbean Forwarding are shell corporations created by Hatcher and used for funneling scheme participants' funds between Hatcher's entities and the participants' entities, in order to disguise the origin of participants' funds and who is controlling them. All of the participants' funds are also commingled in a further effort to hide who owns and controls the funds.

52. American Barristers is purportedly Prudential Trustees' law firm. According to www.PrudentialTrustees.com, to qualify to become a Prudential customer, a prospective customer must first work with legal advisors at American Barristers. Hatcher claims he checks, through American Barristers, to ensure that he does not get involved with any illegal activity regarding the trusts and IBCs. However, defendants know that U.S.

14

citizens are required to report all of their income.  Nevertheless, Hatcher stated to the IRS that he never checked to verify that any of the U.S. citizens involved in his scheme had reported their income.

53.  American Barrister PA is a United States corporation, located in Florida and owned by Hal Uhrig.  Uhrig is a Florida attorney with a law firm called "The Defense Group," based in Maitland, Florida. American Barrister PA LTD is a Bahamian IBC, which was started by Uhrig in 2000.  Hatcher says the IBC was never used and is no longer a valid corporation; its bank accounts were closed in 2002.  It is unclear which American Barrister corporation, if any, is actually working with defendants and/or scheme participants.

### Movement of Participants' Funds

54. Reinhart sets up and handles all of the bank accounts and accounting records for the scheme participants.  She has the sole signature authority on every bank account involved and prepares statements of transactions for the participants.  According to Hatcher, defendants know the origin of all participant money, when and where it was transferred, how it was spent, and the balances.  All of the participants' bank statements are mailed to a mail box drop in Florida, controlled by Reinhart and Hatcher.

55.  Some participants send their money directly to the bank account created by Reinhart for their sham IBC through wire transfers, cashier checks, or checks.  Other

15

participants send funds to the bank accounts of the various entities Hatcher has created to hide and transfer participant funds.

56. According to Hatcher, once the participants deposit their funds into the bank account of one of their IBCs or one of Defendants' entities, Reinhart contacts the bank to transfer the participant's money at the direction of the participant. For example, participants may direct Reinhart to use their deposit to buy securities for a brokerage account or pay the business and personal expenses of the American business they have hidden in one of Defendants' foreign trusts or IBCs.

57. In a further attempt to conceal the relation between scheme participants and their deposits, Reinhart routinely sends wire transfers from participants' accounts to accounts in China, Canada, Hong Kong, and Switzerland. The money is then funneled back to scheme participants.

58. Analyses of the deposits into the bank accounts that Reinhart controls show that the participants' funds come from scheme participants who own businesses in the United States which they have hidden in the "offshore asset protection scheme." Their company addresses are located in the United States, as determined from Reinhart's monthly rent payments for each business and from websites related to a few of the participants' entities. Further, at least 26 of the corporations involved in the scheme were incorporated in Delaware (by Reinhart) and nine have filed U.S. corporate income tax returns.

16

## Websites

59. As mentioned above, defendants have created two websites which are associated with the asset protection scheme. The primary website is www.PrudentialTrustees.com, which is affiliated with defendants' entity Prudential Trustees. Hatcher stated in an interview with the IRS that he created and maintains www.PrudentialTrustees.com.

60. The PrudentialTrustees website claims that it provides strict confidentiality for its customers and never identifies Prudential's owners or staff. The site states that Prudential communicates with customers through a secure server and secure email so that "records that might otherwise be troubling or damaging to the client are entirely unavailable to subpoena power from the United States or Canada."

61. The defendants make various false claims on the Prudential website which are noted throughout this complaint, including the false claim that the transactions involved in defendants' asset-protection scheme will result in tax-free income. This website contains 75 pages discussing "how" and "why" someone should set up an offshore asset-protection scheme. The website only contains one page, at the end, advising American participants to pay their income taxes. This purported disclaimer is designed to be used to deflect attention from all the false statements that precede it, should law-enforcement authorities take action against defendants.

17

62. The defendants' second website, www.BahamasBusinessCentre.com, promotes the establishment of a "virtual offshore office" for defendants' customers. The site states that the Bahamas Business Centre "will strive to provide your customers with the impression that our dedicated phone secretaries are your employees working in your corporate office." It further states that "your private business Nassau number may be listed in Nassau information or the yellow pages giving you the appearance, of having an actual office on the Island."

63. Bahamas Business Centre offers a "protected" fax forwarding service which purportedly prevents fax messages from becoming "subject to a subpoena" and assists in the development and design of offshore websites for the participants' IBCs. Bahamas Business Centre also claims to use an "Offshore Encrypted Terminal Server" to allow scheme participants to view their business records and accounting information without having this information forwarded to their home country. Defendants claim this method provides for "absolute Bullet Proof Asset Protection" because no one except the participant has knowledge of the amount of income generated by a participant's business.

64. Defendants falsely claim that a United States-based business can take advantage of the Bahamas Business Centre by having all of its business transactions run through the Bahamas Business Centre in order to appear to be operating in the foreign country, and, therefore avoid United States tax on income from a business located in the United States.

18

65.  In actuality, a sham business presence in the Bahamas does not erase the actual presence of an active business in the United States or exempt the income from that business from U.S. federal income tax requirements.

## Customers

66.  Several past participants and at least six current participants have transferred their active American businesses into purportedly "foreign" IBCs and trusts established by defendants in an attempt to evade federal income taxes.

67.  For example, Jay Nelson, owner of CN Productions, a Rockford, Illinois based pornography business, used defendants' asset-protection scheme to violate a federal permanent injunction entered against him in 1999 barring him from sending spam email and to hide $624,330 of income from the IRS between 1999 and 2000.  In 2002, Nelson, along with Hatcher, Reinhart, and several others, were held in civil contempt for violation of the permanent injunction.

68.  The injunction permanently barred Nelson from hacking into AOL e-mail accounts and using those accounts to send bulk e-mail advertising for his American business, which sold a variety of pornographic products and services.  While the lawsuit was pending, defendants set up a sham sale of Nelson's business to a bogus Bahamian IBC

19

created by defendants. Defendants then set up a second entity from which Reinhart paid
Nelson's employees. The business activities and control never changed, only the name.
Nelson still received funds from his American business by way of transfers to a fraudulent
trust from defendants' various entities, which Nelson controlled.

69. Through this set-up, Nelson hid his identity while continuing to hack into AOL
accounts and hide income from the IRS to evade federal income taxes. Nelson did not file
federal income tax returns for tax years 1999 or 2000, and the IRS audited him in 2005.
The IRS determined that Nelson had hidden over $620,000 of income from the IRS via one
of defendants' fraudulent trusts and credit card accounts set up by defendants between 1999
and 2000. Five of Nelson's employees were also audited by the IRS in 2005. The IRS
determined that, in total, these individuals received over $175,000 of unreported income
through a credit card account with defendants' entities between 1999 and 2000. The total
tax deficiencies for all six of the CN Productions employees for 1999 through 2000 is
$311,896.

70. Francis Sharrak, owner of Live Centerfold Girls and More ("LCGM"), a
Michigan based pornography business, was also sued by AOL in 1998 for hacking into
AOL e-mail accounts and using those accounts to send bulk e-mail advertising for LCGM's
pornographic products and services. In 1999, Sharrak and LCGM were permanently barred
from further hacking into AOL email accounts. While the lawsuit was pending, defendants
set up numerous offshore accounts for Sharrak. Sharrak still received funds from his

20

American pornography business by way of transfers to these offshore accounts from defendants' various entities, which Sharrak controlled. Sharrak also received at least 12 offshore credit cards through defendants' entities, which Sharrak gave to friends and family and used to move funds in and out of his offshore accounts.

71. Through this set-up, Sharrak hid his assets from AOL, and hid his LGCM income to evade federal income taxes. Sharrak did not file federal income tax returns for tax years 1998, 1999 or 2000, and the IRS audited him in 2005. The IRS determined that Sharrak had received over $3.9 million through defendants' entities between 1998 and 2000 and owed $1,265,344 in federal income taxes for those three years.

72. At least 40 current scheme participants located all over the United States, and in Canada, Europe, Asia and Australia, use the defendants' asset-protection scheme to hide their income from the IRS. Six of these current scheme participants are using defendants' scheme to hide their ownership of and their income from at least seven active businesses in the United States. In total, between 2002 and 2005, these participants funneled over $23 million through defendants' entities.

73. One scheme participant funneled almost $14 million of that $23 million total through defendants' entities between 2002 and 2005. The participant uses defendants' scheme to hide income from a California medical receivables business and a Nevada race-horse business. Bank records show that the participant has received almost $14 million from his businesses but has not reported this income on his U.S. individual federal income

21

tax returns. In addition, neither business has ever filed a U.S. corporate income tax return. This participant also uses the defendants' scheme to hide his ownership of a million-dollar home located in California.

74. Robert Deiss uses defendants' scheme to hide income from his motorcycle parts business, Motorcycle Products Consulting, Inc., in Hollister, California which imports custom parts from a Korean based business. Reinhart handles all of the incoming and outgoing transactions of Deiss's business. When the motorcycle business makes a sale, Reinhart deposits the income into Prudential Trustee's bank account and then moves the funds at Deiss' direction, e.g. to Korea to buy motorcycle parts for Deiss's business. Between 2002 and 2005, Deiss received over $2.6 million in deposits from defendants' entities; however, Deiss has reported less than $530,000 of income on his U.S. individual federal income tax returns between 2002 and 2005.

75. Motorcycle Products did not file a U.S. corporate income tax return until 2005. The return reports $1.6 million in gross receipts but does not list any compensation to officers, and there is no evidence that a W-2 (to report income to employees from the business) or a Form 1099 (to report income to shareholders from the business) was filed for Deiss's income from his business. Deiss uses the asset protection scheme to evade reporting and paying federal taxes on his personal income from his business.

76. Glenn and Lorraine Davis, located in Elkton, Florida, use defendants' scheme to hide income from their U.S. air-pollution-control-systems business, Source Vac Inc.

Reinhart handles the books and records and all of the incoming and outgoing financial transactions of the Davises' business as well as payment of the Davises' personal expenses. Between 2002 and 2005, the Davises have received over $2.7 million in deposits from defendants' entities. The Davises have also acquired a substantial amount of real estate in Arizona without being identified as the true owner through use of defendants' scheme.

77. Although bank records show that the Davises have received income from the corporation, the Davises have never filed individual federal income tax returns. Source Vac has filed corporate income tax returns, but the returns do not list any compensation to officers, and there is no evidence that a W-2 or a Form 1099 was filed for the Davises' income from their business. Accordingly, the Davises use the asset-protection scheme to evade reporting and paying federal taxes on their personal income from their business.

78. Jerome Soh, a Canadian citizen, has used defendants' scheme to hide his ownership of an auto parts and auto repair businesses, Sohfast Auto Parts and West Coast Distributors located in Ferndale, Washington. Reinhart again handles all of the incoming and outgoing financial transactions of Soh's businesses. Between 2002 and 2005, Soh received over $300,000 in deposits from defendants' entities. Bank records show that Soh has received income from the businesses; however, Soh has never filed a U.S. individual federal income tax return and his businesses has never filed U.S. corporate income tax returns. Soh uses the asset-protection scheme to evade reporting and paying federal taxes on his personal income from his businesses.

23

79. Kevin Seto has used defendants' scheme to hide his ownership of two Internet companies that sell backyard decks and spas in the United States under the names Alliance Woodcraft Manufacturing, Inc., and Backyard King, Ltd., which operate out of Fort Pierce, Florida and Chicago, Illinois, respectively.  Websites for the businesses can be found at www.alliancewoodcraft.com and www.backyardking.com.  Reinhart handles all of the incoming and outgoing financial transactions of Seto's businesses.  Between 2002 and 2005, Seto has received over $1.3 million in deposits through defendants' entities; however, Seto has never filed a U.S. individual federal income tax return.  Both of Seto's companies have filed U.S. corporate income tax returns, but the returns follow the same pattern as the above examples, failing to list any compensation to officers, and indicating that no W-2 or Form 1099 was filed for Seto's income from his businesses.  Accordingly, Seto uses defendants' asset-protection scheme to evade reporting and paying federal taxes on his personal income from his businesses.

80. At least 53 current scheme participants (33 individuals and 20 corporations) have used their foreign trust or IBC to invest in American brokerage accounts through defendants' entities and have not reported their income from these brokerage accounts on their federal income tax returns.  The participants include Canadian and U.S. citizens who pooled their funds and invested in a purported Bahamian corporation which then loaned the money to a medical receivables business in California.

24

81. In 2002, the medical receivables business issued $1.8 million in principal and interest to the scheme participants by means of cashiers checks issued by First National Bank of Central Florida and distributed by Reinhart. The participants did not report this income on their U.S. individual tax returns, and the medical receivables business has never filed a U.S. corporate income tax return.

82. Some 15 to 25 current scheme participants made similar investments in U.S. certificates of deposit in 2004. Again, defendants issued funds to the participants but the participants did not report the income on their individual tax returns and the defendants failed to file Forms 1099 (to report income to shareholders from the business) for the participants.

### Harm to Public

83. Between 2000 and 2005, approximately $28 million flowed through various accounts handled by defendants Hatcher and Reinhart. Of the $28 million, $23 million can be associated with six scheme-participants who are operating active businesses in the United States.

84. The United States is harmed by defendants' scheme because defendants' participants are understating their tax liabilities on federal income tax returns and failing to report and pay their correct tax liabilities. The IRS estimates that the promotion has caused revenue losses of over $4.3 million over a four year period from 1998 to 2005.

85. This estimated loss does not include the costs to the government of detecting and correcting the incorrect tax returns resulting from defendants' scheme.

86. Additional tax revenue losses have occurred for later years, which the IRS has not yet quantified. Some of the taxes for which defendants' customers are responsible may never be collected, resulting in a permanent loss to the Treasury.

87. The current scheme participants are located all over the United States, Canada, Europe, Asia, and Australia.

88. The Internal Revenue Service is harmed because it must dedicate scarce resources to detecting and examining inaccurate returns filed by defendants' participants and to attempting to assess and collect unpaid taxes.

89. In addition to the harm caused by their advice, statements and services, defendants' activities undermine public confidence in the fairness of the federal tax system and incite non-compliance with the internal revenue laws.

90. If defendants are not enjoined, they are likely to continue to engage in conduct subject to penalty under IRS §§ 6700 and 6701, and other conduct that substantially interferes with the enforcement of the internal revenue laws.

### Count I

### Injunction under IRC § 7408

91. Plaintiff incorporates by reference the allegations in paragraphs 1-90, above.

26

92. I.R.C. § 7408(a) authorizes a district court to enjoin any person from engaging in conduct subject to penalty under I.R.C. §§ 6701 and 6700 if the person has engaged in such conduct and injunctive relief is appropriate to prevent recurrence of that conduct.

93. I.R.C. § 6700 imposes a civil penalty on any person who, in connection with organizing, promoting, or selling a plan or arrangement, or assisting in organizing, promoting or selling a plan or arrangement, makes a statement that the person knows or has reason to know is false or fraudulent as to the allowability of a deduction or credit, the excludability of any income, or the securing of any tax benefit by participation in the plan or arrangement.

94. Defendants have organized and promoted, or assisted in organizing and promoting a tax shelter, plan, or arrangement that has the sole purpose of hiding the assets and taxable income of scheme participants.

95. In promoting and selling this so-called asset-protection plan, defendants made materially false or fraudulent statements to participants regarding tax benefits and the taxability of their income placed in various trusts and purported foreign businesses.

96. Based on defendants' false statements, scheme participants understated their federal income liabilities on their tax returns, or improperly filed no returns at all.

97. Defendants knew or had reason to know that they were making false or fraudulent statements (within the meaning of I.R.C. § 6700) in connection with promoting

27

the so-called asset protection scheme and that such false or fraudulent statements were material.

98. I.R.C. § 6701 imposes a civil penalty on any person who aids or assists in, procures, or advises with respect to, the preparation or presentation of any portion of a return, claim or other document, who knows (or has reason to believe) that such portion will be used in connection with any material matter arising under the internal revenue laws, and who knows that such portion would result in an understatement of the liability for tax of another person.

99. Defendants prepare trust documents for participants to create the appearance that participants have relinquished the control of their assets, including their interests in active American businesses. Defendants falsely state on their websites that if participants place their assets, including their interest in an American business, into one of defendants' trusts or IBCs, American tax laws no longer apply to the participants' income. Defendants also produce statements of each scheme participant's financial transactions that are part of the scheme.

100. Defendants have engaged in preparing or presenting a portion of a tax return or other document, knowing that such portion will be used in connection with a material matter arising under the internal revenue laws, and knowing that such portion (if so used) would result in understating the tax liability of another person. Defendants' conduct, therefore, is subject to penalty under I.R.C. § 6701.

101. Defendants have engaged in conduct subject to penalty under I.R.C. §§ 6700 and 6701, and they are subject to an injunction under I.R.C. § 7408.

## Count II

### Injunction under IRC §7402

102. Plaintiff incorporates by reference the allegations in paragraphs 1- 101, above.

103. I.R.C. §7402 authorizes a court to issue orders of injunction as may be necessary or appropriate for the enforcement of the internal revenue laws.

104. Defendants, through the actions described above, have engaged in conduct that interferes substantially with the enforcement of the internal revenue laws.

105. If defendants are not enjoined, the United States will suffer irreparable harm because the losses caused by defendants' actions will continue to increase.

106. While the United States will suffer irreparable injury if defendants are not enjoined, defendants will not be harmed by being compelled to obey the law.

107. The public interest would be advanced by enjoining defendants because an injunction will stop their illegal conduct and the harm that conduct is causing the United States Treasury and the public.

108. If defendants are not enjoined, they are likely to continue to interfere with the enforcement of the internal revenue laws. Defendants have a history of disregard for the internal revenue laws, as well as a criminal history involving fraudulent activities.

109.  An injunction under §7402 is necessary and appropriate, and the United States is entitled to injunction relief under I.R.C. §7402.

### Relief Sought

WHEREFORE, the plaintiff, the United States of America, respectfully prays as follows:

A.  That the Court find that defendants have engaged in conduct subject to penalty under IRC §§ 6700 and 6701, and that injunctive relief is appropriate under I.R.C. § 7408 to prevent defendants and anyone acting in concert with them from engaging in any further such conduct;

B.  That the Court find that defendants have engaged in conduct that interferes with the enforcement of the internal revenue laws, and that injunctive relief against them and their representatives, agents, servants, employees, attorneys, and anyone acting in concert with them is appropriate to prevent the recurrence of that conduct under the Court's inherent equity powers and I.R.C. § 7402(a);

C.  That the Court, under I.R.C. §§ 7402 and 7408 enter a permanent injunction prohibiting defendants as well as their agents, servants, employees, attorneys, and anyone in active concert or participation with them from directly or indirectly:

(1) Organizing, promoting, marketing, operating, or selling the offshore asset protection scheme or any other tax shelter, plan, or other arrangement that advises or assists customers to attempt to hide income, shelter assets, or otherwise violate the internal

30

revenue laws or unlawfully evade the assessment or collection of their federal tax liabilities;

(2) Causing or assisting other persons and entities to understate or underpay their federal tax liabilities;

(3) Making false statements about the allowability of any deduction or credit, the excludability of any income, or the securing of any tax benefit by the reason of participating in their offshore asset protection scheme or any other tax shelter, plan or arrangement;

(4) Engaging in any other conduct subject to penalty under I.R.C. § 6700, including making or furnishing, in connection with the organization or sale of a tax shelter, plan or arrangement, a statement about the securing of tax benefits that the defendants know or have reason to know is false or fraudulent as to any material matter;

(5) Engaging in activity subject to penalty under I.R.C. § 6701, including advising with respect to, preparing, or assisting in the preparation of a document related to a material matter under the internal revenue laws that includes a position they know will result in an understatement of tax liability;

(6) Engaging in any other conduct subject to penalty under any penalty provision of the IRC, or engaging in any other conduct that interferes with the administration or enforcement of the internal revenue laws.

D.  That the Court, pursuant to I.R.C. § 7402, enter an injunction requiring defendants to produce to counsel for the United States a list identifying (by name, address,

31

e-mail address, phone number, and Social Security or other tax identification number) all participants who have used any tax shelter, plan, or other arrangement that defendants have operated, sold, or promoted.

E.  That the Court, pursuant to I.R.C. § 7402, enter an injunction requiring defendants at their own expense to contact by mail (or by e-mail, if a mailing address is unknown) all customers who have participated in their asset-protection scheme and inform them of the Court's findings concerning the falsity of defendants' representations and attach a copy of the permanent injunction, and to file with the Court, within 20 days of the date when the permanent injunction is entered, a certification signed under penalty of perjury that they have done so;

F.  That the Court, pursuant to I.R.C. § 7402, enter an injunction requiring defendants at their own expense to provide to counsel for the United States copies of all bank, accounting, and any other financial records pertaining to their asset-protection scheme and any related transactions, for the period January 1, 2000, through the present.

G.  That the Court order the defendants to remove the current content of their websites relating to the asset protection scheme and post a copy of the Court's order as the only content of those websites for a period of two years.

H.  That the Court allow the United States full post-judgment discovery to monitor compliance with the injunction;

32

I. That the Court retain jurisdiction over this action for purpose of implementing and enforcing the final judgment and any additional orders necessary and appropriate to the public interest; and

J. That the Court grant the United States such other and further relief as the Court deems appropriate.

Respectfully submitted,

JEFFREY H. SLOMAN
United States Attorney

SHANA M. STARNES
Pennsylvania Bar 201317
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 7238
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 616-1707
Email: shana.m.starnes@usdoj.gov

Dated: July 31, 2009.

33

JS 44 (Rev. 2/08)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

**I. (a) PLAINTIFFS**

United States of America

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Shana M. Starnes, Tax Division, US Department of Justice, 555 4th St, NW, Washington DC 20001, 202 616-1707

**DEFENDANTS** Byron Hatcher and Kim Reinhart, individually and d/b/a as Prudential Trustees, Bahamas Business Centre, Equity Mutual Funding, Trustee Accounting, Universal Documents, and Caribbean Forwarding  ⊞

County of Residence of First Listed Defendant    Indian River
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

Attorneys (If Known)

**(d)** Check County Where Action Arose:  ☐ MIAMI- DADE  ☐ MONROE  ☐ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☑ INDIAN RIVER  ☐ OKEECHOBEE  HIGHLANDS

| **II. BASIS OF JURISDICTION** (Place an "X" in One Box Only) | **III. CITIZENSHIP OF PRINCIPAL PARTIES**(Place an "X" in One Box for Plaintiff |
|---|---|

(For Diversity Cases Only)                                    and One Box for Defendant)

|  |  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|---|
| ☑ 1 U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) | Citizen of This State ☐ 1 ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 ☐ 4 |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) | Citizen of Another State ☐ 2 ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 ☐ 5 |
|  |  | Citizen or Subject of a ☐ 3 ☐ 3 Foreign Country | Foreign Nation | ☐ 6 ☐ 6 |

2:09CV14263-Graham
Lynch

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 |  | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine |  | Safety/Health |  | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | **PERSONAL PROPERTY** | ☐ 690 Other |  | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 380 Other Personal | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | ☐ 385 Property Damage | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | Product Liability | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☒ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. Security | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General |  | 26 USC 7609 | ☐ 900 Appeal of Fee Determination |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** |  | Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities | ☐ 540 Mandamus & Other | ☐ 462 Naturalization |  |  |
|  | Employment | ☐ 550 Civil Rights | Application |  | ☐ 950 Constitutionality of State |
|  | ☐ 446 Amer. w/Disabilities | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus-Alien |  | Statutes |
|  | Other |  | Detainee |  |  |
|  | ☐ 440 Other Civil Rights |  | ☐ 465 Other Immigration Actions |  |  |

**V. ORIGIN** (Place an "X" in One Box Only)

☐ 1 Original Proceeding   ☐ 2 Removed from State Court   ☑ 3 Re-filed- (see VI below)   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. RELATED/RE-FILED CASE(S).** (See instructions second page):
a) Re-filed Case ☑ YES ☐ NO    b) Related Cases ☐ YES ☑ NO
JUDGE Jose E. Martinez    DOCKET NUMBER 08-cv-14383

**VII. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):
26 U.S.C. s. 7402(a) and 7408; Civil injunction suit against tax scheme promoters

LENGTH OF TRIAL via  4  days estimated (for both sides to try entire case)

**VIII. REQUESTED IN COMPLAINT:**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ Injunction    CHECK YES only if demanded in complaint:  JURY DEMAND: ☐ Yes ☑ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD
s/

DATE  7/31/09

FOR OFFICE USE ONLY
AMOUNT _WAIVED_   RECEIPT # _____   IFP ____